ILLINOIS CENT. R. CO. v. H. ROUW & CO., No. 2.—159 S. W. (2d) 839.

Western Section.    November 15, 1940.

Petition for Certiorari denied by Supreme Court, March 1, 1941.

J. P. Rhodes, of Milan, and Clinton H. McKay, of Memphis, for plaintiff in error.

Robert P. Adams, of Trenton, for defendant in error.

ANDERSON, J.  This was an action by the original plaintiff, H. Rouw & Company against the Illinois Central Railroad Company, wherein the plaintiff sought to recover compensation for the damage done a carload shipment of strawberries entrusted to it for transportation.  The determinative question presented for consideration does not require that we concern ourselves with whether the action was one ex contractu or one sounding in tort.  The gravamen of the complaint is to be found in the charge that the plaintiff delivered to the

defendant at Greenfield, Tennessee, 440 crates of strawberries which being at that time in sound, merchantable condition were delivered to the consignee at destination in a damaged condition. No specific acts of negligence were charged.

The defendant plead the general issue and also filed a special plea to the effect that the deterioration, if any, was brought about by the inherent vice in the shipment and not by any fault of the defendant.

The issues thus made were submitted to a jury, resulting in a verdict and judgment for the plaintiff. The defendant appealed in error.

The sole question for consideration arises upon the defendant's contention that there was no evidence to support the verdict and that, hence, the judgment should have sustained its motion for a directed verdict made at the conclusion of all evidence.

The scope of the inquiry has been narrowed in this Court. There is no question but that the shipment arrived in a damaged condition and none with respect to any delay. The insistence of the defendant is that the undisputed evidence was to the effect that it had furnished a proper car, had iced and re-iced it properly, and that the damaged condition of the strawberries at destination was due to their inherent nature. In short, it contends that strawberries, being of a perishable nature, its duty was to exercise ordinary care only in handling of the shipment and that it performed that duty when it furnished a suitable car and kept the shipment properly iced throughout the time it was in its possession.

Before discussing the evidence, it is expedient to examine the principles of law that are applicable to the controversy.

With respect to perishable commodities the obligation of a carrier is not that of an insurer against loss or damage arising solely from their nature and inherent character, as, for instance, where they succumb to the forces of natural decay, fermentation or evaporation without fault on the part of the carrier. As against hazards of this character its obligation is to exercise ordinary care to preserve the property in the condition in which it was delivered to it, that is, that degree of care which prudent men would ordinarily exercise with respect to their own property under similar circumstances. It is no moe liable for loss or destruction resulting solely from the inherent infirmity of such goods, than it is for loss entailed solely by an act of God or of the public enemy. Sindle v. American Ry. Express Co., 8 Tenn. App., 594; 13 C. J. S., Carriers, sec. 79, p. 151 et seq. This rule has been developed as another exception to the general rule of the common law imposing upon a common carrier of goods for hire a measure of liability which, in practical effect, is that of an insurer, with certain other well-known exceptions not necessary to mention.

With respect to these principles there seems to be very general agreement among the cases, but not so as to the burden of procedural steps and the burden of proof.

█ The general rule, subject to certain exceptions arising out of contractual exemptions, is that upon proof of the delivery of property to a carrier in good condition and the delivery in bad condition to the consignee, a prima facie case of liability is made out in the sense that if there be no explanation at all as to the cause of the loss or damage, judgment against the carrier is warranted. Compare Railroad Co. v. Naive, 112 Tenn., 239, 264, 79 S. W., 124, 64 L. R. A., 443.

The disagreement to be found in the decisions is with respect to just how far the carrier must go in order to overcome the prima facie case thus made, that is, whether he must prove affirmatively that the loss or damage was due to the inherent nature and qualities of the goods within the rule above stated, or whether the presumption, by virtue of which the plaintiff is held to have made a prima facie case, is overcome by proof by the carrier that it exercised ordinary care to preserve the condition of the shipment and retard the natural processes of decay and deterioration while it was in its care.

The cases dealing with the question are collected in a note appearing in 115 A. L. R. 1274. It would serve no useful purpose to enter upon a discussion of them here.

█ We think a case of the kind indicated is assimilable to a case involving loss or damage to livestock in the hands of a carrier for transportation. In such case the mere factum of the loss or damage does not fix absolutely the liability of the carrier but simply operates to impose upon it the necessity of showing that the loss or damage did not result from its negligence and this may be done by proof that the shipment was handled in such a manner as to warrant the conclusion that the requirement of ordinary care had been met, without further proof that such loss or damage was due to the peculiar propensities of the animal. Railway Co. v. Wynn, 88 Tenn., 320, 332, 14 S. W., 311. The weight of authority we think supports the view that this rule is also applicable in the handling of perishable property. Railroad Co. v. Naive, supra; Southern Pac. Co. v. Itule, 51 Ariz., 25, 74 P. (2d), 38, 115 A. L. R., 1268, and cases cited in the note thereto; Howe v. Great Northern Railroad Co., 176 Minn., 46, 222 N. W., 290; Higgins & Co. v. Chicago, B. & Q. R. Co., 135 Minn., 402, 161 N. W., 145, L. R. A., 1917C, 507; Railway Express Agency v. H. Rouw & Co., 198 Ark., 423, 128 S. W. (2d), 989; Railway Express Agency v. H. Rouw & Co., 197 Ark., 1142, 127 S. W. (2d), 251.

The case of Railway Co. v. Wynn, supra, was an action to recover the value of a mare entrusted to the carrier for transportation from Gallatin, Tennessee, to Lexington, Kentucky. The animal died before reaching her destination. The trial judge charged the jury that if the mare was shown to have been in good condition when delivered to the carrier it was encumbent on the latter to show that her death was not caused by its negligence. With respect to this the Court,

after pointing out that the strict common-law rule of liability of a carrier of goods had been relaxed ''so that the carrier may exonerate itself from responsibility by either showing that the case falls within one of the exceptions of the common law, or within one of the stipulations of the special contract'' [88 Tenn., 320, 14 S. W. 314] and holding that the instruction given by the trial judge was correct as far as it went, said: ''But his honor should have gone further in this case, and told the jury that the mere fact that the mare was found to be dead on reaching her destination did not absolutely fix the liability of the carrier, but simply devolved upon it the necessity of showing that the death did not result from its fault or negligence, which it might do by proof that its cars were in good and safe condition; that the transportation was made with all proper care; and that there were no bruises or signs of injury upon the dead body, or indications that death followed from other than natural causes.''

■ This we construe as a recognition of the fact that the carrier may exonerate itself from the imputation of negligence resulting from the plaintiff's prima facie case by showing that the shipment had been handled with ordinary care.

The logic that supports this rule with respect to the carrier's responsibility in the case of a shipment of livestock applies with equal force in the transportation of perishable commodities. See Southern Pac. Co. v. Itule, supra.

There is said also to be some disagreement in the cases with respect to the burden of proof in a case of this kind. A substantial part of the conflict which is seemingly more apparent than real we think may be attributed to the failure to make clear the sense in which the phrases, ''prima facie case,'' ''burden of proof,'' and ''presumption of negligence'' are used. As to this, see 5 Wigmore on Evidence, Sec. 2485 et seq., and 2494 et seq.

■ Under the practice in this state the burden of proof, in its usual and primary meaning, as the risk of nonpersuasion of the trier or triers of fact, never shifts, but remains throughout the trial where it was in the first instance. The burden of producing evidence may, however, shift from time to time in the course of the trial. One way in which this is brought about is by means of presumptions which the law raises upon proof of certain facts; that is to say, in some instances the law attaches to a given state of facts certain procedural consequences with respect to the duty of producing countervailing evidence by an opponent. A learned discussion of the subject is to be found in the leading case of North Memphis Savings Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 196 S. W., 492. See also, Shockley v. Morristown Produce & Ice Co., 158 Tenn., 148, 11 S. W. (2d), 900; Lewis v. Casenburg, 157 Tenn., 187, 7 S. W. (2d), 808, 60 A. L. R., 254; Whipple v. McKew, 166 Tenn., 31, 60 S. W. (2d), 1006.

480

■ The "effect of a presumption 'of law' (that is the real presumption)" says Dean Wigmore in his treatise on Evidence, "is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent." 5 Wigmore on Evidence (2 Ed.), Sec. 2491. But it is important to know that a presumption of this kind adds nothing to the probative force of the facts that give rise to it and when its purpose has been accomplished, that is, when the party against whom it is raised has produced countervailing evidence, the presumption disappears and the question for decision then is whether the preponderanc of the evidence with respect to the determinative issue or issues is with the party who had the burden of proof in the first instance. Whipple v. McKew, supra; see Central of Georgia Railway Co. v. Fuller Combing Gin Co., 2 Tenn. Civ. App. (2 Higgins), 343.

■ As the Court very aptly observed in Frank W. Wright, 140 Tenn., 535, 548, 205 S. W., 434, 437, presumptions are raised to take the place of proof and "where the proofs are present there is neither foundation nor room for the presumption."

Although it was a somewhat different kind of case, the reasoning of the Court in Railway Co. v. Manchester Mills, 88 Tenn., 653, 14 S. W., 314, is instructive.

It remains to apply these principles to the facts of the case in hand.

The bill of lading under which the shipment moved was issued by the carrier's agent at Greenfield, Tennessee, and dated May 13, 1935. It names the consignee as H. Rouw & Company, the destination Matton, Illinois, and the car in which the property was loaded as MDT No. 155694. While the shipment was en route the destination was changed to Waterloo, Iowa. The car furnished by the carrier was a refrigerator car in good condition and the shipment was loaded by the shipper after the car had been "precooled" through a process, the efficacy of which was not questioned. There is a controversy as to whether the loading of the shipment was finished on the night of the 13th or early the morning of the 14th, but under the evidence that is immaterial. The shipment arrived at Waterloo, Iowa, at 5:45 P. M. May 15th. It was inspected at 8:30 A. M. on May 16, 1935, by a representative of the Western Weighing and Inspection Bureau. That portion of his report relating to the condition of the strawberries was as follows: "15 to 25%, average 20% of crates occurring irregular different parts of cars show 1 to 1½ inch below top of cups—mass of wet leaky berries, staining cup and crates—juice running over other crates, appearance of Rhizopus rot of field origin, with occasional scattered gray mold. Scattered throughout crate 1 found gray mold and tan rot, balance of crates show a lefel full jumble pack and a nomal red color and green calyx."

The plaintiff offered expert evidence to the effect that Rhizophus rot was a technical name for a blue mold that develops "under high,

warm temperature, when something starts to decay;'' and that the condition in which the berries were found to be upon arrival at destination was not of field origin and if it had existed at the time they were loaded, it could have been detected; that that condition could not have developed under proper refrigeration, that is, if the atmosphere inside the car had been maintained at a proper degree. Proper refrigeration, it was shown, required a temperature of 40 degrees at the bottom of the load and 42 degrees at the top of the load inside of the car at all times while a shipment is in transit.

Without objection the plaintiff also showed by an expert witness that a shipment of strawberries of the particular variety here in question and in good condition will remain in practically the same condition for a period of 10 to 14 days, when loaded in a properly pre-cooled refrigerator car and properly iced while en route.

In accordance with the terms of the bill of lading the shipment moved under what is referred to as ''standard refrigeration'' which was shown to mean that the car should be re-iced ''to capacity at all regular icing stations.'' The defendant introduced the tariff showing the regular icing stations on the route traversed and it also showed by its records that at each of these stations a sufficient amount of ice was put in the bunkers to fill them to capacity and furthermore that an inspection of the car when opened upon its arrival at destination showed ''Commodity temperature top 42°, Bottom 38°,'' with ice a distance of six inches from the top of the bunkers. This evidence with respect to what was reflected by defendant's records was undisputed and upon the strength of it the defendant contends that it affirmatively appears without dispute that it did all that an ordinarily prudent person would have done to retard the natural process of decay and maintain the shipment in the same condition it was in when received at point of origin. In short, it contends that having shown that it furnished a proper car and re-iced it to capacity at all regular icing stations specified by the tariff it did all that was required of it under its obligation to exercise ordinary care in the handling of the shipment.

The defendant did not introduce as witnesses the men who iced the cars. As we say it relied solely on proof of what its records showed with respect to the performance of this duty. Assuming, without deciding, that under the particular facts of this case the records were so far properly proven as that the information disclosed by them was and is to be accepted as true for the purpose of passing upon the motion for a directed verdict, we think the fallacy in the defendant's contention lies in its omission to take into consideration the necessity of not only keeping the required quantity of ice in the bunkers, but in placing it therein in the proper manner. It is not accurate to say that the obligation of the defendant was with respect to the quantity of the ice only. Its duty was to exercise ordinary care to maintain the temperature inside the car at a stage that would

preserve the sound condition of the shipment. Under the evidence the conclusion was warranted that this required not only a proper quantity at proper intervals but that the ice be placed in the bunkers in the proper manner by being "piked down" to prevent "honeycombing." An expert shown to have had extensive experience in the shipment of perishable property was examined with respect to the effect of "honeycombing" resulting from a failure to "pike down" the ice when the supply in the bunkers of a refrigerator car was replenished. He testified that circulation of the air through the ice "furnishes refrigeration;" that the bunkers in each end of the car were open at the bottom and the top on the inside so as to permit the air to circulate in the manner that was essential; that "these bunkers are wire netting, the ice will seal over and seal the air, naturally the air can't pass through something that is sealed up;" that "it takes meltage of ice to create refreigeration and, naturally if the is sealed over and won't melt there is no refrigeration" and that it is useless to add ice without first breaking the "honeycomb" by "piking" through it.

One of the defendant's employees on cross-examination testified that in re-icing a car, if it is filled to capacity the rules and regulations require that the ice already in the bunker be broken through with a pike pole before the additional ice is added.

No evidence was offered to show that the process of piking down the ice required to maintain proper refrigeration in transit was carried out. Now, it was obviously within the power of the defendant to show this fact, if such it was, and from its failure to do so it was permissible to draw an inference, which was evidence in itself, to the effect that if proof upon the point had been adduced it would have been contrary to the insistence of the defendant that the shipment was properly iced. Standard Oil Co. v. State, 117 Tenn., 618, 672, 100 S. W. 705, 10 L. R. A. (N. S.), 1015; Western Union Tel. Co. v. Lamb, 140 Tenn., 107, 203 S. W., 752; Fisher v. Travelers' Ins. Co., 124 Tenn., 450, 483, 138 S. W., 316, Ann. Cas. 1912D, 1246; Pickard v. Berryman, 24 Tenn. App., 263, 142 S. W. (2d), 764.

In this situation quite apart from the exploded presumption, it cannot be said that there was no evidence to support the verdict of the jury upon the determinative question as to whether the defendant had discharged its obligation to exercise ordinary care in handling the shipment.

We have reached this conclusion without having found it necessary to pass upon the question of whether expert evidence alone in the form of an answer to a hypothetical question would be sufficient in a case of this kind to make a jury question when opposed to direct evidence tending to show that a shipment of this kind was properly iced and hence handled with ordinary care. Nor have we found it necessary to concern ourselves about whether under the particular

circumstances presented by the present record that was an appropriate field for expert evidence.

The result is that the judgment is affirmed at the cost of the defendant.

Senter and Ketchum, JJ., concur.